IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FRANKLIN JOSEPH WEIMER,      )
                             )
           Petitioner,       )
                             )    Civil Action No. 08-1092
      v.                     )
                             )
JEFFREY BEARD, *et al.*,     )
                             )
           Respondents.      )

# MEMORANDUM OPINION

CONTI, District Judge.

Franklin Joseph Weimer ("Petitioner"), brings the instant petition for writ of habeas corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254, attacking his 2002 convictions in the Court of Common Pleas of Fayette County, Pennsylvania. Petitioner was found guilty by a jury of third degree murder, 18 Pa. Cons. Stat. § 2502(c), and endangering the welfare of children, 18 Pa. Cons. Stat. § 4304, with respect to the death of his girlfriend's two-year-old son. Petitioner was sentenced to an aggregate term of imprisonment of 22 ½ to 45 years imprisonment on November 15, 2002.[1] (ECF No. 10-42 at 5-8, 27, 29). The sole claim raised in this counseled petition is the following:

> Ineffective assistance of trial counsel in violation of the Sixth
> Amendment to the Constitution of the United States for failing to
> request a continuance during trial to enable his expert witness in
> the field of pathology to examine the table, which was the crucial
> piece of evidence in the case, to determine whether the table leg
> size and dimensions comported with the child's fatal injuries.

---

[1] This sentence was imposed after Petitioner's second trial on these charges. The first trial, which took place in 1998, resulted in his conviction of the same crimes. The Superior Court of Pennsylvania, however, granted a new trial on direct appeal. See (ECF No. 1-4 at 15).

(ECF No. 1 at 5-6) (internal capitalization removed to improve ease of reading). Respondents filed an answer on December 22, 2008.[2] (ECF No. 10). For the reasons stated below, this petition will be denied.

A. **Facts of the crime**

The facts presented at trial were summarized by the state trial court as follows (with citations to the record omitted):

> On January 24, 1998, around 11:00 p.m., Julie Rose Johnson left for work from her residence in Hopwood, Pennsylvania, leaving her sleeping two-year old son, Zachary Ronald Johnson, the victim, in the care of her boyfriend, the Defendant, Franklin Joseph Weimer. The Defendant and Zachary were the only persons

---

[2] Respondents' answer, which was submitted after three motions for extension of time (ECF Nos. 6, 8, and 9), is a six-page document that contains only one pinpoint citation to the record. It presents no real legal argument regarding the merits of Petitioner's sole claim for relief, and seems, at best, to be only tangentially related to the arguments made in the instant petition. See generally ECF No. 10.

Additionally, the state court records produced by Respondents are so poorly organized as to appear to be the result of the scanning of a pile of random documents related to Petitioner's underlying criminal cases. Respondents attempted to group the record into 97 numbered exhibits. See ECF No. 10-1 at 1-6. For reasons that are unclear, these exhibits were scanned onto the docket in 44 electronic documents, and were arranged in a manner that does not correspond to the exhibit list that was provided. Id. at 1-6. Adding insult to injury, Respondents included the following message at the top of this filing: "**NOTE: Exhibits were numbered and scanned prior to this list and are now out of order. Notations are made as to what Exhibit they were scanned as.**" Id. at 1 (emphasis in the original). The "notations" provided by Respondents were inconsistent and largely inadequate.

In order to adjudicate this case properly, this court was forced to comb through roughly 3600 pages of exhibits provided by Respondents, and create an index cataloguing which exhibit on the docket contained which documents from the state court record. This undertaking was not a trivial matter, and it unnecessarily and unacceptably delayed the resolution of this case. See Doeblers' Pennsylvania Hybrids, Inc., v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (noting that "Judges are not like pigs, hunting for truffles buried in the record.") (internal quotes and citations omitted).

present in the residence after Ms. Johnson's departure. Approximately one half hour later, the Defendant contacted Ms. Johnson at work and informed her that Zachary had fallen down the stairs, whereupon she instructed him to call 911 and then immediately left work and drove home.

The Defendant called Fayette County 911 at 11:37 p.m. and spoke with dispatcher Pritts. When Pritts asked if there was an emergency, the Defendant stated that his son was playing with the phone and dialed the number by mistake. Approximately two minutes later, at 11:39 p.m., the Defendant again called 911, this time requesting an ambulance for a child who had fallen down three steps and was now unconscious. The dispatcher asked the Defendant for directions to the residence and inquired about the child's condition. The Defendant said that Zachary looked as though he had been knocked out and had several bumps and bruises on his head.

Upon arrival, paramedics treated Zachary at the scene and then took him to the Uniontown Hospital helipad, from which he was flown to Children's Hospital in Pittsburgh, Pennsylvania, where he was admitted to the intensive care unit with severe head trauma.

On January 25, 1998, while Zachary was in intensive care, the Defendant was interviewed by Trooper Wayne Burkes and Corporal Don Johnson of the Pennsylvania State Police. When he was asked what had occurred, the Defendant indicated that the child had fallen down some stairs. He stated he found Zachary at the bottom of the steps whimpering, and he saw marks on his head. He admitted that when he called 911, he told the dispatcher that the child had been playing with the phone. He stated that following the call, Zachary became rigid and started vomiting and foaming at the mouth and he then made the second phone call to 911.

Zachary died on January 26, 1998, at 4:00 a.m. An autopsy was performed and revealed that the cause of death was blunt force trauma to the head. Dr. Cyril Wecht, Allegheny County Coroner, indicated that the manner of death was homicide.

On that same day, after Zachary's death, the Defendant voluntarily went to the Pennsylvania State Police barracks in Uniontown. After signing a form waiving his *Miranda* rights, he was interviewed by Troopers David W. Simpson and Donald S. Lucas. Initially, the Defendant recounted the same story he had given the state police while at Children's Hospital, maintaining that Zachary's injuries apparently had been caused by a fall down a set

of stairs. However, when the Defendant was shown autopsy photographs of the child, and a wooden shower brush the police had found at the residence, the Defendant changed his story. The Defendant's new version of what had occurred was that the child woke up and came into the living room. He began playing with the child and held him by one arm and one foot, swinging him around like an airplane. The Defendant stated that he became dizzy and hit Zachary's head into the corner of the wall between the living room and kitchen, dropped the child, and then fell on him. It was at this point that the Defendant called the child's mother.

At trial, Dr. Cyril Wecht, testifying within a reasonable degree of medical certainty, stated that Zachary's injuries could not have been sustained in a fall down three steps, as the Defendant had initially maintained. Dr. Wecht further testified that Zachary's injuries could not have been caused by the Defendant swinging him into the corner of the wall and falling on top of him, which was the Defendant's second version of the incident. Dr. Wecht also testified that Zachary's injuries could not have been caused by striking the table leg in the living room, which was a third version offered by the Defendant's expert at trial as to how the child was injured. According to Dr. Wecht, the shower brush found at the scene, or something very similar to the brush, was consistent with the kind of instrumentality that could have produced Zachary's head injuries, and that a minimum of four blows had been landed by an instrumentality consistent with the brush. Additionally, Dr. Wecht testified that other injuries to Zachary's head were consistent with a human hand.

(ECF No. 10-19 at 19-23).

Petitioner's expert at trial, Dr. Wayne Ross, testified that the victim's injuries were consistent with the victim having been swung counter-clockwise into a table located at the scene of the crimes. (ECF No. 10-27 at 79-80). Using the photographs of the table available to him, Dr. Ross indicated that he was able, within a reasonable degree of medical certainty, to match a pattern of bruises on the victim's head with a pattern of grooves or carvings on the legs of the table. (Id. at 67-68, 71-72).

4

The prosecutor pointed out on cross-examination that Petitioner told police he swung the child in a clockwise direction. (Id. at 80). Dr. Ross indicated that this did not change his opinion, and that the child's injuries were consistent with either a clockwise or counter-clockwise motion, depending on the direction that the child was facing when he was swung by Petitioner.[3] (Id. at 81, 85-86, 94). Dr. Ross did not physically examine the table prior to trial, but instead used photographs of the table to illustrate his testimony. (Id. at 67-68, 71-72, 94). Petitioner's trial counsel chose not to request a continuance to permit Dr. Ross to examine the table. Petitioner was ultimately found guilty by a jury, and was sentenced on November 15, 2002.

After his direct appeals were exhausted, Petitioner timely filed a petition collaterally attacking his conviction pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541, *et seq.* (ECF No. 1 at 4). On November 1, 2005, a hearing was held on Petitioner's PCRA petition. Dr. Ross testified at the hearing that the table would have been a useful tool to demonstrate to the jury where the child's head would have struck in either a scenario where he was being swung with a clockwise or counter-clockwise motion. (ECF No. 10-30 at 16-17, 31, 33-34). Prior to testifying at the PCRA hearing, Dr. Ross had the opportunity

---

[3] It is clear from Dr. Ross's testimony Petitioner's 2002 criminal trial that he had been surprised to learn that Petitioner had stated that he had swung the victim with a clockwise motion. (ECF No. 10-27 at 79-80). Dr. Ross, however, affirmatively testified during cross-examination at least twice that the injuries sustained by the victim could have been due to his head striking the table when being swung with a clockwise motion. (Id. at 85-86, 94). One example of such testimony by Dr. Ross is as follows:

> What I can state to a reasonable degree of medical certainty is that the evidence we have here is consistent with his statement of swinging the child either in a clockwise rotation or a counter clockwise rotation where the child is face up as we assume for your purposes, or face down depending upon where the table is.

(Id. at 85-86).

5

to examine the table physically, and, based on his measurements and the pattern of injuries in the victim's head, he indicated that he was able to determine possible locations of impact, depending on the direction of the swing. (Id. at 16). He also stated that the examination of the table did not change his opinion, as it was presented at trial, that the victim's injuries were consistent with striking the table with a counter-clockwise motion or a clockwise motion. (Id. at 40, 45-46).

Petitioner's counsel from the 2002 criminal trial testified at the PCRA hearing as well. He indicated that his decision not to ask for a continuance to allow Dr. Ross to examine the table was due to his focus on forensic evidence that could have been obtained from the table – such as tissue, hair, and DNA – instead of observational data – such as measurements of the table itself – to demonstrate to the jury that the victim's head had collided with the table. (Id. at 54). Based on the information available to him at the time of trial Petitioner's counsel believed that any forensic evidence on the table likely would have degraded during the more than four years that lapsed between the crimes and Petitioner's second trial, thus limiting the value of an examination for such purposes. (Id. at 54-55). Counsel opined that he "should have" asked Dr. Ross to examine the table during the trial, and described his not doing so as resulting from "tunnel vision" with respect to the use of forensic testing. (Id. at 54-55).

The court hearing the PCRA petition made several factual findings from the testimony presented, including that an examination of the table would not have changed Dr. Ross's opinion offered at trial that the child's injuries could have been caused by either a clockwise or a counter-clockwise motion, and that he was able to use photographs of the table to demonstrate his theory to the jury. (ECF No. 10-34 at 44-45).

B.	**Merits standard.**[4]

A federal court may not issue a writ of habeas corpus unless it concludes either: (1) the state court's adjudication resulted in a decision that is "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States; or (2) the state court adjudication was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). "Under § 2254(d)(1)'s unreasonable application clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000). With respect to the "unreasonable determination of the facts" clause of 28 U.S.C. § 2254(d)(2), a petitioner must demonstrate that a reasonable fact-finder could not have reached the same conclusions given the evidence. If a reasonable basis existed for the factual findings reached in the state court, then habeas relief is not warranted. Campbell v. Vaughn, 209 F.3d 280, 290-91 (3d Cir. 2000), cert. denied, 531 U.S. 1084 (2001). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

---

[4] Petitioner's claim was presented to the state courts in a proceeding brought pursuant to the Pennsylvania PCRA, and on appeal from the denial of PCRA relief. Thus, Petitioner exhausted available state court remedies, and his claim is not subject to a state court procedural default that would bar review. See O'Sullivan v. Boerckel, 526 U.S. 838, 845-48 (1999) (habeas petitioner must give state "one full opportunity" to address claims, including compliance with state's procedural rules).

C.   **Analysis**

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Id. at 690.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id.

The second prong requires a petitioner to demonstrate that counsel's errors deprived him or her of a fair trial and the result was unfair or unreliable. Id. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id. It is well established that the test

8

for ineffective assistance of counsel under Pennsylvania law is identical to the Strickland test. See Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2003).

The relevant state court rulings were made by the PCRA court when it rejected Petitioner's ineffective assistance of counsel claim. That PCRA trial court held that, while Petitioner's claim was of "arguable merit[,]" it was based on counsel's strategy to focus on "forensic evidence rather than physical measurements or other observational data."[5] (ECF No. 10-34 at 44, 48-50.) The PCRA trial court concluded that this was a reasonable strategy. (Id. at 50-51). That court further determined that Petitioner had failed to show prejudice due to counsel's failure to seek a continuance, noting that, at the criminal trial, Dr. Ross had testified that the victim's injuries were consistent with striking the table leg with either a clockwise or counterclockwise motion. (Id. at 52). As Dr. Ross himself testified during the PCRA hearing, examining the table prior to trial would not have changed his opinion concerning this fact. (Id. at 53); (ECF No. 10-30 at 46). While Dr. Ross did indicate that he would have been better able to demonstrate to the jury where on the table the child would have struck under his theory, the PCRA trial court noted that "the jury was not without a physical representation of the table[,]" as Dr. Ross used photographs of the table to demonstrate his theory. (ECF No. 10-34 at 52-54). It was by using these same photographs that Dr. Ross was able to conclude within "a reasonable degree of medical certainty" that the victim's fatal injuries were caused by his head striking one of the legs of the table. (ECF No. 10-27 at 71-74); (ECF No. 10-34 at 50-51); (ECF No. 10-41 at 38-41).

---

[5] In addition to Petitioner's trial counsel's testimony during the PCRA hearing, this conclusion is supported by Dr. Ross's testimony at trial indicating that, as an initial matter, the table should be examined "for fiber evidence, for hair evidence, for any sort of blood evidence that may be on the table . . . ." (ECF No. 10-27 at 94). Dr. Ross echoed this opinion during Petitioner's PCRA hearing. (ECF No. 10-30 at 27-28).

9

The Superior Court relied on the PCRA trial court's analysis of Petitioner's ineffective assistance of counsel claim, determining that it was the result of counsel's reasonable strategy at trial, and dismissed it. (ECF No. 1-1 at 4-5).

As an initial matter, as stated above, the Pennsylvania standard for ineffective assistance of counsel applied by the PCRA court is not itself contrary to or an unreasonable application of Strickland. See Werts, 228 F.3d 178, 204 (3d Cir. 2000). To the extent that Petitioner argues that the PCRA appellate court deviated from the Strickland standard based on its citation to language that a PCRA court must view "evidence on the record . . . in the light most favorable to the prevailing party[,]" id. at 2 (internal quotes and citations omitted), this court is unpersuaded. This statement was no more than a general recitation of the standard for determining the sufficiency of the evidence used to convict.[6] See, e.g., Wishnefsky v. Myers, No. 4CV030417, 2005 WL 1498502, at *9 (M.D. Pa. June 22, 2005) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). Additionally, both the Superior Court and the PCRA trial court correctly stated the Pennsylvania standard for ineffective assistance of counsel, see (ECF No. 1-1 at 3); (ECF No. 10-34 at 47-48). It is presumed that the state courts know the law and correctly apply it. See, e.g., Woodford v. Viscotti, 537 U.S. 19, 24 (2002). Based upon a thorough review of the record, it is clear that Petitioner did not demonstrate an unreasonable application of federal law.

Additionally, Petitioner failed to demonstrate that the PCRA court made unreasonable findings of fact. Counsel testified that his strategy at trial was to focus on any forensic evidence on the table – which was found to be reasonable by the PCRA trial court. In light of the record, including the dueling expert testimony presented by the Commonwealth and Petitioner, such a

---

[6] The Pennsylvania standard and the federal standard have been held to be identical on this issue as well. Wishnefsky v. Myers, No. 4CV030417, 2005 WL 1498502, at *9 (M.D. Pa. June 22, 2005) (citing Commonwealth v. Keaton, 556 Pa. 442, 455 (Pa. 1999)).

determination by the state courts was not unreasonable, and is entitled to deference under the AEDPA.[7]

Finally, even if Petitioner were able to establish that the state courts had engaged in an unreasonable application of federal law, or had made unreasonable factual determinations, his claim still fails under de novo review, because he has not demonstrated prejudice. The record clearly shows that Dr. Ross was able to present his theory of how the victim was injured, and related his findings to the jury through the use of drawings and photographs. The photographs were of sufficient quality that he was able to use them to form his theory "to a reasonable degree of medical certainty" even without the ability to take measurements, and he was able to map the pattern of bruises on the victim's head onto patterns in the table's leg with the use of the photographs at issue. Dr. Ross stated that, after examining the table, his opinion on how the victim sustained his injuries was unchanged.

It is clear that the failure of Petitioner's counsel at his 2002 criminal trial to seek a continuance so that Dr. Ross could examine the table prior to his testimony, as well the lack of the table as a visual aid, did not impair Dr. Ross's ability to demonstrate his theory to such a degree that confidence is undermined in the outcome. This conclusion is especially true in light of the Commonwealth's presentation at trial of expert medical testimony that the victim had

---

[7] Some authority exists for the proposition that, when analyzing a claim of ineffective assistance of counsel under Strickland, it is preferable to begin with the prejudice prong. McAleese v. Mazurkiewicz, 1 F.3d 159, 170 (3d Cir. 1993). That case, however, was decided before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub.L. No. 104-132, 110 Stat. 1214. The AEDPA requires that, when adjudicating habeas petitions, federal courts must give deference to the decisions of state courts, unless the state court's decision was contrary to, or an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. See 28 U.S.C. § 2254(d). As the Superior Court ended its analysis of Petitioner's claim after finding that trial counsel's performance was not deficient, and did not address the issue of prejudice, this court finds it appropriate to begin its analysis with the performance prong of the Strickland test.

11

suffered from multiple blows to the head, and Petitioner's prior inconsistent statement regarding how the victim sustained his injuries. The expert's testimony is premised on Petitioner's version of events. His opinion is only helpful if the jury believes the multiple, devastating wounds were produced by accident. Even if the expert had examined the table and provided the same opinion, i.e., that it could occur in either way, there is no reasonable probability of a different result.

### D. Certificate of Appealability

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). Because Petitioner has not made such a showing, a certificate of appealability will be denied.

An appropriate order will follow.


Dated: September 29, 2011          By the court:


                                   s/Joy Flowers Conti
                                   JOY FLOWERS CONTI
                                   UNITED STATES DISTRICT JUDGE

cc:
Counsel of record